Filed 1/11/23  P. v. Garcia CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>       v.<br><br>ALEJANDRO GARCIA,<br><br>    Defendant and Appellant. | G060701<br><br>(Super. Ct. No. 01NF1540)<br><br>O P I N I O N |

Appeal from a postjudgment order of the Superior Court of Orange County, Patrick H. Donahue, Judge.  Affirmed.

Richard Schwartzberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski and Genevieve Herbert, Deputy Attorneys General, for Plaintiff and Respondent.

Alejandro Garcia appeals from a postjudgment order after the trial court denied his petition for resentencing pursuant to Penal Code section 1170.95.[1]  Garcia argues there was insufficient evidence he was guilty of second degree implied malice murder.  We disagree and affirm the postjudgment order.

FACTS

A.  *Substantive Facts*

The following facts are taken from trial testimony in *People v. Garcia et al.* (Super. Ct. Orange County, 2002, No. 01NF1540).  We granted the Attorney General's unopposed motion to augment the record on appeal with the trial court record from that case.  (*People v. Garcia* (May 26, 2005, G032368) [nonpub. order].)

A complete recitation of the facts is unnecessary.  We provide only those facts relevant to the issue on appeal.

1.  *Prosecution Evidence*

Vincent Contreras, his cousin David Ybarra, Josh Lyons, and Bert Martinez imbibed before picking up Contreras's cousin, Tina Chavez, and driving to a party in Anaheim about 11:00 p.m.  At the party, the men drank more beer.

Sometime later, Garcia and Gregory Harris arrived in Garcia's Chevrolet Tahoe (Tahoe).  Garcia, Harris, another male who was wearing gloves, and possibly a fourth male entered the party.  Chavez introduced Ybarra and Contreras to Garcia and Harris, whom she referred to as her cousin "Shadow."

---

[1]     All further statutory references are to the Penal Code.  Effective June 30, 2022, the Legislature renumbered section 1170.95 to section 1172.6.  (Stats. 2022, ch. 58, § 10.)  There were no substantive changes to the statute.  For purposes of clarity, we refer to the statute as section 1172.6 throughout the opinion.

Lyons decided to watch Garcia, Harris, and their companions because they looked like gang members and because of the gloves. Lyons, an admitted Gardena 13 gang member, believed the gloves meant the men had weapons. Ybarra shared Lyons's concern.

Later that evening, Harris walked past Lyons and bumped his foot. Lyons asked, "'What's up?'" Harris replied, "'This is Artesia, Shadow.'" Lyons responded, "'It's Gardena.'" An argument and scuffle ensued. Contreras pushed Lyons and Ybarra pushed Harris breaking up the fight. Garcia, Harris, and their companions left the party. Contreras and his group waited two or three to 15 minutes to leave to avoid any further arguments or fights with Harris and Garcia's group.

As Contreras and his group walked to Martinez's car, the Tahoe pulled up quickly next to them and stopped, and Garcia and Harris got out. Garcia approached and asked, "'What's up? You want something with my homeboy?'" or something similar. Contreras interpreted the words to be a gang challenge.

Contreras asked, "What?" as he and his companions walked toward Martinez's car. Garcia and the other man approached Contreras's group. Harris and a fourth man, who were initially standing near the Tahoe, also followed them. While walking behind Contreras's group, Harris said, "'Come here.'" Lyons warned Ybarra that Harris was "strapped." Ybarra replied, "'I know, stupid. Get in the car.'" Garcia and Harris followed them, and Harris repeatedly said, "[C]ome here."

When Contreras's group turned the corner onto the street where Martinez's car was parked, Contreras and Ybarra walked across a lawn while Lyons and Martinez walked on the street. Harris and the gloved man walked toward Contreras and Ybarra. Garcia and possibly a fourth man approached Martinez and Lyons. Contreras anticipated they would fight.

Garcia walked to within eight feet of Lyons holding a 40-ounce beer bottle in his hand. Garcia held the beer bottle "like [he was] ready to hit [Lyons] with it."

3

Lyons opened Martinez's car door and told Garcia to "back up." Garcia continued and came within five feet of Lyons. Lyons retrieved an anti-theft security device (club) from Martinez's car, separated it into two pieces, and gave one piece to Martinez. Lyons swung half the club at Garcia and told him to "back up." Garcia stepped back.

Meanwhile, Harris and the fourth male approached Contreras and Ybarra. Contreras feared they were going to rush him and Ybarra from behind. Contreras and Ybarra turned toward Harris. While they argued, Contreras noticed Harris held his hand to his side, but he could not see what was in his hand. Contreras and Ybarra took a couple steps toward Harris and the other male and stopped. Harris was pacing.

Contreras and Ybarra were about 10 to 15 feet away from Harris and the fourth male "squaring off" to fight. Harris fired a gun. Garcia had just backed away from Lyons when Harris fired the gun. Harris and Garcia ran to the Tahoe. Neither Contreras nor Ybarra were armed with any weapon. Ybarra died from a gunshot wound to the chest.

The day after the shooting, the police arrested Garcia. They searched his home and Tahoe and found "Artesia" gang paraphernalia. During an interview, Garcia admitted he was an Artesia gang member and was at the party. Garcia heard an argument but did not know who was involved and did not see the shooting.

The police also arrested Harris the same day and found "Artesia" gang paraphernalia on his person. During an interview, Harris admitted he was an Artesia gang member but denied he was at the party.

Detective Mark Brooks testified as the prosecution's gang expert and detailed his background, training, and experience. Brooks was familiar with the Artesia gang and provided detailed testimony concerning its history, claimed territory, membership, signs and symbols, primary activities, and predicate acts. Brooks testified concerning the culture and habits of turf-oriented Hispanic criminal street gangs, including the importance of respect. Brooks explained that if a person disrespects a gang

4

member, the gang member will retaliate "equal to or greater than" and the escalation can be "drastic." He stated the act of retaliating enhances the gang's and the gang member's reputation because it demonstrates the gang is to be feared and to not enter the gang's claimed territory. He said "backup" is when a fellow gang member helps another gang member during a confrontation. He added that acting as backup increases that gang member's reputation in the gang because it demonstrates you can be trusted. He testified concerning "gang guns," guns that gang members pass around to other gang members. He stated that based on his experience, if one gang member in a car has a gun other gang members in the car know who has the gun in case they need the gun.

Brooks opined Harris was an active member of Artesia based on his self-admission, gang-related tattoos, prior police contacts, and the facts of this case. Brooks also opined Garcia was an active member of Artesia based on his self-admission, his possession of gang paraphernalia, his prior associations with Harris, and the facts of this case.

Based on a hypothetical paralleling the facts of the case, Brooks concluded that beginning at the party, there were a series of gang-related challenges that escalated to a foreseeable shooting to earn respect for the gang. He opined Harris's and Garcia's conduct promoted, furthered, and assisted Artesia and enhanced its reputation outside the community of Artesia. He said Harris earned respect by using the ultimate weapon for his gang. After noting the two groups split into four groups, he said Garcia earned respect by using a bottle as a weapon and "taking a lead role for himself [and the gang]." He explained that by committing a murder in Anaheim, Harris and Garcia demonstrated Artesia gang members can go anywhere and do what they want. The murder also enhanced their reputations in Artesia because it showed they were willing to stand up for the gang outside of its boundaries.

5

## 2. *Defense Evidence*

Harris's defenses were self-defense and he was not an active Artesia gang member. Harris testified he was an Artesia gang member but tried to distance himself from the gang. He admitted though that at the time of the shooting, he was associating with Artesia gang members, including Garcia. Harris also testified that a couple of weeks before the shooting, he acquired a gun for protection and carried it with him, including at the party.

Harris testified that Garcia picked him up in his Tahoe and drove them to the party. Harris claimed that at the party Lyons confronted him, there was an altercation, he left the party, and waited for Garcia at the Tahoe. Outside the party, after another gang challenge and pushing, Harris noticed Ybarra had a metal pipe in his hands and raised the pipe in the air. Harris believed Ybarra was going to hit him with the pipe and possibly kill him, and he shot Ybarra. Harris testified the first thing Garcia said when he saw him was, "'What the fuck happened?'" Harris offered testimony Ybarra was under the influence of methamphetamine, which can cause people to be aggressive and overreact. Character witnesses testified concerning Ybarra's prior acts of violence and his reputation for aggressive behavior. Garcia's defenses were he was not involved in the shooting and he was not an active Artesia gang member.

Steven Strong, a defense gang expert, acknowledged that Artesia was a criminal street gang and a gang member may leave a gang by not associating with the gang anymore. On cross-examination, Strong acknowledged that an admitted gang member who had a gun and expected to use lethal force would tell fellow gang members he was armed.

## B. *Procedural Facts*

An information charged Garcia, and Harris, with first degree murder (§ 187, subd. (a) (count 1)) and street terrorism (§ 186.22, subd. (a) (count 2)). As to count 1, the information alleged Garcia vicariously discharged a firearm for a criminal

street gang (§§ 12022.53, subds. (d), (e)(1), 186.22, subd. (b)(1)).  The jury convicted Garcia of both counts and found the allegations true.  The trial court sentenced Garcia to 25 years to life on count 1, 25 years to life on the vicarious firearm enhancement, and two years on count 2 for a total prison term of 52 years to life.  This court affirmed.  (*People v. Garcia, supra,* G032368.)

Years later, Garcia filed a petition for writ of habeas corpus pursuant to *People v. Chiu* (2014) 59 Cal.4th 155, superseded by statute as stated in *People v. Gentile* (2020) 10 Cal.5th 830, 849 (*Gentile*).  The trial court vacated Garcia's first degree murder conviction.  The prosecution accepted a reduction to second degree murder.  At sentencing, the court denied Garcia's motion to dismiss the section 12022.53 enhancement.  The court sentenced Garcia to 15 years to life on count 1 and 25 years to life on the vicarious firearm enhancement for a total prison term of 40 years to life.  This court affirmed.  (*People v. Garcia* (Dec. 7, 2020, G059337) [nonpub. opn.].)

Garcia filed a petition for resentencing pursuant to section 1172.6.  The prosecution filed a response.  The trial court concluded he made a prima facie case for relief and issued an order to show cause.  The parties filed additional briefing.

At several hearings, the trial court noted it had read the trial transcripts, our prior opinion in *People v. Garcia, supra,* G032368, and the motions.  The court stated, and the parties agreed, the court would act as an independent trier of fact and determine whether Garcia was guilty under a valid theory of murder based on trial testimony and not our prior opinion.

At the hearing on the order to show cause, counsel argued and the trial court repeated its standard of review and the applicable law articulated in *Gentile, supra,* 10 Cal.5th 830, and *People v. Powell* (2021) 63 Cal.App.5th 689.  After providing the relevant facts, the court opined the prosecution established beyond a reasonable doubt that Garcia was guilty "on an implied malice theory of murder."  The court noted, "I want

7

to make it clear that the court is not finding that there was an aiding and abetting an intent to kill." The court denied Garcia's section 1172.6 petition.

DISCUSSION

Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) inter alia eliminated murder liability under the natural and probable consequences doctrine and provided a procedure for those convicted under that doctrine to seek relief. (*Gentile, supra,* 10 Cal.5th at pp. 843, 847-848.) However, Senate Bill 1437 did not eliminate second degree implied malice murder. (*Id.* at p. 850.) As the *Gentile* court stated, "[N]otwithstanding Senate Bill 1437's elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life." (*Ibid.*; *People v. Powell* (2021) 63 Cal.App.5th 689, 713 [direct aider abettor must through words or conduct aid commission of life endangering act, not result of that act].)

The parties disagree on the applicable standard of review. Garcia concedes that generally we would review the trial court's determination for substantial evidence. However, he cites to cases arising from different procedural postures to contend that because the trial court here reviewed the trial court transcript and did not hear live testimony our review is de novo. The Attorney General, of course, disagrees.

Garcia cites to no cases, and we found none, where the appellate court independently reviewed a trial court's determination under section 1172.6 of a documentary record. And appellate courts have applied the substantial evidence test to trial court determinations under section 1172.6. (See *People v. Ramirez* (2021) 71 Cal.App.5th 970, 984-985; *People v. Williams* (2020) 57 Cal.App.5th 652, 663.) Although the weight of authority establishes the substantial evidence test is the proper standard, based on the record before us we independently conclude the evidence demonstrates Garcia was guilty of second degree implied malice murder.

8

Here, there was overwhelming evidence Garcia knew his words and conduct endangered the life of another and acted with conscious disregard for life. The evidence demonstrated Harris and Garcia, both self-admitted Artesia gang members, went to a party. At the party, Harris initiated a gang challenge to Lyons and there was a scuffle. Harris and Garcia left the party. But they did not leave the area. Instead, they waited until Lyons, Contreras, and their group left the party.

Garcia and Harris approached Contreras's group together. Garcia challenged Contreras by asking him, "What's up?" or something similar. When Contreras and his group continued walking to their car, Harris told Lyons, "Come here." Garcia continued to pursue the group alongside an armed Harris. Harris admitted at trial he carried the gun everywhere he went. Both the prosecution's and the defense's gang experts provided testimony from which to conclude Garcia knew Harris was armed. To be sure, Lyons and Ybarra both believed Harris had a gun.

When Contreras's group turned a corner and split into two groups, Garcia, who was armed with a 40-ounce beer bottle, pursued Lyons and Martinez. Garcia moved to within five feet of Lyons holding the bottle in a manner that caused Lyons to believe Garcia was going to hit him. Garcia's threatening conduct caused Lyons to arm himself with a club and swing it at Garcia to fend him off. As he did, Harris fired his gun at Ybarra, killing him.

Garcia makes much of the fact that he was not involved in the argument at the party and he backed away from Lyons when he swung the club at him. Garcia's lack of involvement in the gang challenge and altercation at the party does not change the fact he decided to wait for the men to leave the party to confront them. Indeed, Garcia admits that by waiting they intended to confront the men. And there was evidence that in a gang confrontation, violence can escalate. That Garcia would step back to avoid being hit with the club does not alter our conclusion. It was self-preservation.

9

The evidence leads to only one conclusion—armed gang members Harris and Garcia waited for gang members who challenged them and worked in tandem to retaliate against them by initiating a violent confrontation where someone lost their life. It is clear that by waiting with an armed Harris to confront gang members who disrespected them, Garcia knew his words and conduct endangered the life of another and acted with conscious disregard for life. The trial court properly denied Garcia's section 1172.6 petition.

## DISPOSITION

The postjudgment order is affirmed.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


MOTOIKE, J.

10